## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

HENRIETTA E. JACKSON, etc.,

        Plaintiff,

vs.                                           Case No. 3:04-cv-444-J-32HTS

UNITED STATES OF AMERICA,

        Defendant.

_____

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On December 14, 2002, Willie Jackson, Jr., tragically died after undergoing an Endoscopic Retrograde Cholangiopancreatography ("ERCP"), which is a procedure used to diagnose and treat recurrent pancreatitis.  Mr. Jackson's wife, Henrietta Jackson, brought suit, in her individual capacity and as the personal representative of Mr. Jackson's estate, against the United States of America under the Federal Tort Claims Act ("FTCA"), claiming that:  (1) Javaid Shad, M.D., an employee of the Department of Navy and the United States, fell below the standard of care when he elected to perform an ERCP; (2) Dr. Shad negligently performed the ERCP; (3) Dr. Shad failed to obtain Mr. Jackson's informed consent to perform the ERCP; and (4) various Department of Veterans Affairs ("VA") healthcare providers were negligent in continuing to prescribe sulfonamide drugs in light of Mr. Jackson's history of pancreatitis.  At trial, plaintiff withdrew all claims against the VA.  The remaining

claims were tried before the Court sitting without a jury from November 14 - 17, 2005. Following the submission of supplemental proposed findings of fact and conclusions of law by both sides, the Court heard closing arguments on December 9, 2005, and, after careful consideration of the record and relevant law, this case is ready for a decision pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## I.   FINDINGS OF FACT[1]

### A.   Background

The parties agree that Mr. Jackson died as a result of the ERCP procedure performed by Dr. Shad on December 12, 2002.  The parties further agree that Dr. Shad performed the procedure within the scope of his employment with the Department of Navy and the United States.  Dr. Shad performed the ERCP to diagnose and potentially treat Mr. Jackson's pancreatitis.[2]  When a patient presents with pancreatitis, if a physician determines to go beyond simply monitoring the patient to see if the situation resolves itself, there are multiple diagnostic tools available.  A

_____

[1]      Where not otherwise indicated, facts are taken from undisputed portions of the record.

[2]      Pancreatitis is inflammation of the pancreas.  The pancreas is a deep abdominal organ with two main functions:  (1) to produce digestive enzymes to facilitate the breakdown of food in the digestive tract (exocrine function); and (2) to produce the pancreatic hormones, insulin and glucagon, to break down sugar in the bloodstream (endocrine function).  Acute pancreatitis, which is sudden onset of abdominal pain due to pancreatic inflammation, ranges in degree from mild to severe; Severe acute pancreatitis is a life threatening illness.

physician can perform an ultrasound or CAT scan, or choose from three more invasive procedures:  ERCP, Endoscopic Ultrasound (EUS), or Magnetic Resonance Cholangiopancreatography (MRCP).

An ERCP is an invasive procedure performed with an endoscope (a long flexible lighted tube).  The endoscope is inserted through the mouth, down the esophagus through the stomach, and into the duodenum, so that the pancreatic ducts and biliary tree can be visualized.  The physician then uses a small cannular device that goes through the scope and injects dye into the common bile and pancreatic ducts to look for various problems or abnormalities.[3]

An EUS is performed by passing an endoscope down the esophagus through the stomach and into the small intestine to the area of examination.  This particular endoscope is equipped with a noninvasive small ultrasound transducer that emits sound waves that create a viewable image of the digestive tract.  An EUS is less invasive than an ERCP.

An MRCP is a special type of MRI (magnetic resonance imaging) technology that highlights the pancreatic and bile ducts.  This procedure is performed without injections of contrast, and is less invasive than EUS and ERCP.  However, MRCP does not provide the detailed view of the pancreas or pancreatic ducts that either the

_____

[3]      In addition to being a diagnostic procedure, ERCP is also employed as a therapeutic procedure designed to treat various pancreatic abnormalities.

ERCP or EUS does.

Approximately ninety to ninety-five percent of pancreatitis cases are caused by gallstones, alcohol use, or are considered idiopathic[4]. The remaining five to ten percent of cases are attributable to drug induced pancreatitis, microlithiasis[5], pancreatic divisum[6], cancers or tumors, infection, and various other abnormalities.

## B.    Mr. Jackson's July 1995 Pancreatitis

In July 1995, Mr. Jackson presented to the Naval Hospital Jacksonville with abdominal pain and elevated amylase[7] levels. At the time of this admission, Mr. Jackson was taking the antihypertension medication Furosemide.[8] Furosemide (Lasix) is a sulfonamide, or a sulfa based drug, which can cause pancreatitis in patients who are allergic to sulfa based drugs. The Navy physicians diagnosed Mr.

_____

[4]    Idiopathic means there is no discernable root etiology or cause of the pancreatitis.

[5]    Microlithiasis is a pancreatic condition where microscopic crystals or stones form in the common bile duct of the pancreas.

[6]    A pancreatic divisum is a congenital defect where there is a division in the pancreatic duct; specifically, the ventral duct and the dorsal duct do not properly connect.

[7]    Amylase is a pancreatic enzyme.

[8]    Furosemide is the generic form of the brand name drug Lasix.

Jackson with drug induced pancreatitis secondary to Lasix, discontinued the Lasix, and observed Mr. Jackson for forty-eight hours.  Mr. Jackson's abdominal pain ceased, his amylase levels stabilized, and the pancreatitis resolved.  The doctors discharged Mr. Jackson with a diagnosis of drug induced pancreatitis secondary to Lasix.  Mr. Jackson did not experience another clinical episode of pancreatitis for the next seven years, or until July 2002.

In April 1996, physicians at the Naval Hospital Jacksonville prescribed Mr. Jackson Bumetanide (Bumex).  Similar to Lasix, Bumex is a sulfa based diuretic designed to treat hypertension.  Mr. Jackson was continually on this medication until April 2000, a four year period, without any known episodes of pancreatitis.[9]

In August 2001, physicians at the Naval Hospital Jacksonville prescribed Mr. Jackson Hydrochlorothiazide (HCTZ), another sulfa based diuretic, to treat hypertension.  Mr. Jackson was prescribed HCTZ for the following eleven months, until approximately July 2002.[10]

### C.   Mr. Jackson's July 2002 Pancreatitis

In July 2002, Mr. Jackson presented to MacDill Air Force Base Hospital in

---

[9]   Naval Hospital Jacksonville and VA Hospital prescription records establish that Mr. Jackson was continually taking Bumex from April 1996 through April 2000.  Doc. 61, Def. Ex. 7, NH/RX 10 - 13; Def. Ex. 9, VA/RX 28, 32, 37.

[10]   Doc. 61, Def. Ex. 9, VA/RX 11-12.

Tampa, Florida, with abdominal pain, and was referred to Tampa Memorial Hospital where it was determined he had elevated pancreatic enzyme levels.  At the time of his admission, Mr. Jackson was taking HCTZ.  The Tampa Memorial physicians diagnosed Mr. Jackson with drug induced pancreatitis, this time due to HCTZ.  The physicians admitted Mr. Jackson to the hospital for three days and discontinued the HCTZ prescription.  Mr. Jackson's abdominal pain resolved, his pancreatic enzyme levels declined, and he was discharged with a diagnosis of drug induced pancreatitis secondary to HCTZ.

### D.    Mr. Jackson's September 2002 Pancreatitis

On September 22, 2002, Mr. Jackson presented to the Naval Hospital Jacksonville emergency room with abdominal pain and elevated pancreatic enzyme levels.  The hospital records denote that Mr. Jackson had been experiencing abdominal pain for three weeks, but that his symptoms had worsened that day.  The physicians gave Mr. Jackson Mylanta, which resolved the problem somewhat, and discharged him with a prescription for Percocet, a painkiller.  Mr. Jackson was referred for a follow-up appointment with Dr. Javaid Shad, the board certified head of gastroenterology at Naval Hospital Jacksonville; his appointment was scheduled for October 16, 2002.

On October 15, 2002, one day before Mr. Jackson's appointment with Dr. Shad, Mr. Jackson had lab work taken, which showed his pancreatic enzyme levels

(amylase and lipase) were normal.[11]  Mr. Jackson also underwent an ultrasound and CAT scan.  The following day, after examining Mr. Jackson, Dr. Shad noted that the etiology of the pancreatitis was not "completely clear"[12], but that there did not appear to be any evidence of gallstones on the ultrasound or CAT Scan; Dr. Shad further noted that his differential diagnosis for Mr. Jackson "include[d] microlithiasis, drugs, pancreatic divisum or idiopathic."[13]  Based on his examination and findings, Dr. Shad determined to order further laboratory testing, and a subsequent ERCP to further examine the pancreatic duct.[14]  Dr. Shad scheduled Mr. Jackson to return in a week to review the test results and further discuss an ERCP.

     **E.    The November 6, 2002 Visit and Recurrent Pancreatitis Diagnosis**

     On November 6, 2002, Mr. Jackson returned to Dr. Shad.  His amylase and lipase levels were normal, and Dr. Shad noted that Mr. Jackson "continue[d] to do well."[15]  Dr. Shad further noted his impression that Mr. Jackson had experienced

---

[11]    Doc. 61, Def. Ex. 4B, JAX 138.

[12]    <u>Id.</u> at JAX 140-142.

[13]    <u>Id.</u> at 142.

[14]    <u>Id.</u>

[15]    <u>Id.</u> at JAX 147.

"recurrent pancreatitis most likely due to drugs," but that he wished to further evaluate with an ERCP on December 12, 2002.[16]

Dr. Shad's decision to perform the ERCP implicates the chronology of Mr. Jackson's Bumex[17] prescription, which was a source of great debate at trial:[18]

The government pharmacy and hospital records concerning Mr. Jackson's 2002 prescription for Bumex do not conclusively elucidate the precise time frame during which Mr. Jackson was taking Bumex that year. The medical records in evidence show that Mr. Jackson was prescribed Bumex on April 26, 2002; the prescription was for a thirty day supply and five refills.[19] However, it is not entirely clear whether Mr. Jackson was taking Bumex from April 26, 2002 through September 22, 2002, when

_____

[16]   Id.

[17]   Similar to Lasix and HCTZ, Bumex is a sulfonamide designed to treat hypertension. Both Drs. Louis Lambiase, defendant's expert, and Richard Sheinbaum, plaintiff's expert, testified that the presence of sulfa in Bumex could cause pancreatitis in patients allergic to sulfonamides. The Physician's Desk Reference (PDR), portions of which were admitted into evidence, provides that "[p]atients allergic to sulfonamides may show hypersensitivity to Bumex," but that "[s]uccessful treatment with Bumex following instances of allergic reactions to furosemide [Lasix] suggests a lack of cross-sensitivity." See Doc. 61, Def. Ex. 11, pp. 1-4.

[18]   Mr. Jackson had previously taken Bumex from 1996 to 2000 without apparent incident. However, when Dr. Shad treated Mr. Jackson in 2002, he was unaware that Mr. Jackson had taken Bumex for that four year period.

[19]   Doc. 61, Def. Ex. 7, NH/RX 20.

he went to the emergency room, or whether Mr. Jackson was prescribed Bumex on April 26, 2002, and did not fill it for the first time until September 7, 2002, which is denoted as the "Last Fill Date" on the pharmacy record.[20]

The government posits that the notation on this pharmacy record that the "Last Fill Date" was September 7, 2002, and that there were 5 refills remaining, shows Mr. Jackson received the Bumex prescription on April 26, 2002, but did not fill it for the first time until September 7, 2002, which is purportedly after the onset of Mr. Jackson's September 2002 pancreatitis.  Plaintiff argues that the logical interpretation of the record is that Mr. Jackson was continually on Bumex from April 26, 2002 until September 22, 2002, when he presented to Naval Hospital Jacksonville with pancreatitis.[21]  The Court is unable to determine which of these equally plausible interpretations is correct due to the patently ambiguous pharmacy record.  There was no conclusive evidence presented at trial, via expert pharmacist testimony or otherwise, as to the correct interpretation.

Adding to the confusion, Mr. Jackson prepared a list of "prescriptions" dated July 2, 2002, which purports to be a list of prescriptions he was taking at that time;

───────────────────────

[20]     Id.

[21]     The record shows that Mr. Jackson was taking HCTZ, a sulfa based hypertension drug, in July 2002.  Unexplained by the plaintiff is whether Mr. Jackson would have been taking two sulfa based hypertension drugs - Bumex and HCTZ - at the same time.

-9-

Bumex is not listed.[22]  Mr. Jackson's August 6, 2002, Naval Hospital Jacksonville record does not list Bumex as a current medication.[23]   The September 22, 2002 Naval Hospital Jacksonville triage record likewise does not list Bumex as a current medication.[24]   However, Dr. Shad's physician notes prepared as a result of the October 16, 2002, visit show that Mr. Jackson had resumed taking Bumex at some point before that visit.[25]  Finally, Dr. Shad testified that Mr. Jackson told him during the October 16, 2002 visit that he had resumed taking the Bumex after the onset of the September 2002 pancreatitis symptoms due to some swelling in his lower extremities.[26]

### F.    The December 12, 2002 ERCP

On December 12, 2002, Dr. Shad performed an ERCP on Mr. Jackson at Naval Hospital Jacksonville.   To perform the ERCP, Dr. Shad used a cannulating

---

[22]    Doc. 61, Def. Ex. 6, MHT 77.

[23]    Doc. 61, Def. Ex. 2, OUT 2 037.

[24]    Id. at OUT 2 034.

[25]    Doc. 61, Def. Ex. 4B, JAX 140-41.

[26]    Doc. 63, Trial Tr. Nov. 16, 2005, Dr. Shad, pp. 57-59.

sphincterotome[27] to fully cannulate the pancreatic duct. The ERCP showed no abnormalities in the pancreas.

After Dr. Shad finished the ERCP, Mr. Jackson received post-operative care, and was discharged from the hospital to return home with Mrs. Jackson that same day. A few hours later, Mr. Jackson experienced abdominal and breathing problems. Mrs. Jackson alerted emergency rescue, who responded and took Mr. Jackson to the emergency room at Naval Hospital Jacksonville. Mr. Jackson was re-admitted to the hospital and diagnosed with ERCP-induced pancreatitis. His pancreatitis worsened and became septic, meaning he developed an infection throughout his bloodstream. Mr. Jackson also developed acute decompensation of the lungs and renal failure. This led to Mr. Jackson's death on the morning of December 14, 2002.

### G.    Dr. Richard Sheinbaum's Testimony

Dr. Richard Sheinbaum was plaintiff's liability expert. Dr. Sheinbaum is a board certified gastroenterologist who works in private practice in Stamford, Connecticut. Dr. Sheinbaum offered expert opinions as to whether: (1) an ERCP was indicated; (2) Dr. Shad properly performed the ERCP; and (3) Dr. Shad obtained informed consent from Mr. Jackson to perform the ERCP.

Dr. Sheinbaum testified that all three of Mr. Jackson's episodes of pancreatitis

---

[27]    A cannulating sphincterotome is a tiny hollow plastic device that allows the user to inject dye or contrast through it into a duct.

(July 1995, July 2002 and September 2002) were clearly due to sulfonamide drugs. Dr. Sheinbaum testified that the Naval and VA health care providers were correct that the July 1995 episode was due to Lasix, and that the July 2002 episode was due to HCTZ; similarly, he stated the September 2002 bout was secondary to Bumex.  Dr. Sheinbaum testified that because Dr. Shad had a clear diagnosis of drug induced pancreatitis and even indicated in Mr. Jackson's medical records that the September 2002 "recurrent pancreatitis" was "most likely due to drugs," Dr. Shad breached the standard of care by performing the ERCP when there was a clear etiology for Mr. Jackson's recurrent pancreatitis.  Dr. Sheinbaum testified that simply discontinuing the Bumex and following the patient was the proper course of action.[28]

Dr. Sheinbaum additionally testified that even if further testing was indicated, Dr. Shad clearly should have chosen an EUS or MRCP, rather than ERCP, because the attendant risks to those procedures are appreciably less than with an ERCP.  Dr. Sheinbaum stated that with EUS and MRCP, Dr. Shad would have been able to elicit the same information about any problems with the pancreas and pancreatic duct without exposing Mr. Jackson to any risk of pancreatitis or death.[29]

Dr. Sheinbaum further testified that an ERCP was contraindicated because

_____

[28]     See generally, Doc. 62 Trial Tr. Nov. 14, 2005, Dr. Sheinbaum, pp. 39, 55, 63-65,72-74, 113-14, 122-23.

[29]     Id. at pp. 82-83, 89-90,

there was almost no chance that Mr. Jackson was suffering from the conditions listed in Dr. Shad's differential diagnosis (pancreatic divisum and microlithiasis).   Dr. Sheinbaum stated that a patient suffering from pancreatic divisum, a congenital defect where the pancreatic duct does not completely fuse so that there are two separate pancreatic ducts, does not normally present with a first bout of pancreatitis at age forty-eight, and certainly does not have a seven year span between bouts of pancreatitis, such as Mr. Jackson had.   He further opined that an ERCP is not superior to an EUS or MRCP to diagnose this condition.

Dr. Sheinbaum testified that an ERCP would be of no use to diagnose microlithiasis.  Moreover, he opined that the lack of increased liver enzymes indicated that microlithiasis was not the cause of Mr. Jackson's pancreatitis.[30]

Dr. Sheinbaum also opined that Dr. Shad negligently performed the ERCP.  Dr. Sheinbaum criticized Dr. Shad's use of a cannulating sphincterotome, as opposed to a regular diagnostic cannula, because a cannulating sphincterotome is wider and increases the risk of ERCP induced pancreatitis.[31]

Dr. Sheinbaum also opined that Dr. Shad was negligent while performing the ERCP because he deeply cannulated the pancreatic duct and completely filled it with

_____

[30]     Id. at pp. 88-92.

[31]     Id. at pp. 85-86, 115-16.

contrast (dye).  According to Dr. Sheinbaum, the deep cannulation and complete filling of the duct increased Mr. Jackson's risk of pancreatitis.  Dr. Sheinbaum opined that there was no need to completely fill the pancreatic duct because, if there was a pancreatic divisum, it would have been readily apparent with a small amount of contrast.[32]

Dr. Sheinbaum also offered an expert opinion on whether Mr. Jackson provided informed consent for Dr. Shad to perform the ERCP.  Dr. Sheinbaum testified that a reasonable person in Mr. Jackson's position who received all of the information about the ERCP, alternative methods of treatment, and the low possibility of Dr. Shad finding one of the conditions listed in the differential diagnosis with the use of an ERCP, could not possibly provide informed consent to proceed with an ERCP.  In addition, Dr. Sheinbaum opined that a reasonable person would not choose one test with a greater chance of complications (ERCP) over another (EUS) when both would be equally effective in diagnosing any potential problems.[33]

**H.    Dr. Louis Lambiase's Testimony**

Dr. Louis Lambiase was defendant's liability expert.  Dr. Lambiase is a board

---

[32]    Id. at pp. 116, 120, 203-04.

[33]    Id. at pp. 102-05, 118, 126.  Dr. Sheinbaum also criticized the consent form used, saying it did not specifically show that the alternatives of EUS and MRCP had been discussed with Mr. Jackson.

certified gastroenterologist and currently serves as the Director of Gastroenterology for the University of Florida at Shands Hospital Jacksonville.  Dr. Lambiase knew Dr. Shad before this case because they had a brief prior working relationship.  Drs. Lambiase and Shad worked together in two different settings.  The first was when Shands and the Naval Hospital created a partnership whereby Dr. Lambiase and other Shands physicians went to the Naval Hospital Jacksonville and, along with Navy physicians, treated veterans and retirees.  The second occasion was when Dr. Shad's tenure with the Navy ended, he temporarily worked as a fill-in physician on an as needed basis at Shands Hospital Jacksonville before beginning his full time private practice.  Dr. Lambiase offered opinions in the same areas as Dr. Sheinbaum, all of which conflict with those of Dr. Sheinbaum.

Dr. Lambiase testified that a definitive drug induced pancreatitis diagnosis is difficult to make, that Mr. Jackson's July and September 2002 bouts of pancreatitis were not clearly due to drugs and that Dr. Shad was correct in his instincts to perform further testing on Mr. Jackson to rule out other potential causes of Mr. Jackson's recurrent pancreatitis.  In making this determination, Dr. Lambiase focused on the back-to-back episodes of pancreatitis in 2002 and the history surrounding Mr. Jackson's prescriptions for HCTZ and Bumex.  Dr. Lambiase testified that in the absence of a firm etiology, as was the case here, doctors seek to rule out potential causes to arrive at a definitive conclusion.  Dr. Lambiase testified that had this been

-15-

a clear case of three separate incidents of drug induced pancreatitis, further testing

would have been contraindicated; however, he opined that was not the case with Mr.

Jackson.[34]

Dr. Lambiase next offered his expert opinion on the proper procedure to

perform once Dr. Shad made the decision that additional testing was necessary. He

testified that since the CAT scan did not rule out microlithiasis, pancreatic divisum,

pancreatic cancer or otherwise provide a clear view of the pancreas, Dr. Shad had

two options:  EUS and ERCP.  Dr. Lambiase testified that in 2002 MRCP was an

evolving technology and thus not a viable option, and that an MRCP would not have

been as useful as EUS or ERCP to obtain a detailed view of the pancreatic duct.[35]

Dr. Lambiase opined that while he would have first performed an EUS, rather

than an ERCP, Dr. Shad's decision to recommend and proceed with an ERCP

certainly fell within the standard of care.  Dr. Lambiase recognized that ERCP has a

greater risk of causing complications, including pancreatitis and death, than an EUS,

but stated that in 2002 gastroenterologists were routinely performing ERCP's to

diagnose the etiology of pancreatitis in patients with Mr. Jackson's presentation.  Dr.

Lambiase's inclination to perform an EUS first was due to his extensive training in

---

[34]   See generally Doc. 64, Trial Tr. Nov. 17, 2005, Dr. Lambiase, pp. 5-8, 18, 67-68.

[35]   Id. at pp. 15-19.

performing EUS's, which essentially placed him ahead of the curve in EUS proficiency in 2002.  He testified that many of his colleagues would have performed an ERCP in this circumstance and that ERCP's, which have been in use for over thirty years, are still performed every day by gastroenterologists, even with the availability of EUS. Ultimately, Dr. Lambiase testified that both an ERCP and an EUS were appropriate to further diagnose (and with ERCP to potentially treat) Mr. Jackson's recurrent pancreatitis.[36]

Dr. Lambiase also opined that Dr. Shad's performance of the ERCP was well within the standard of care.  Dr. Lambiase stated that the use of a cannulating sphincterotome, as opposed to a regular catheter or diagnostic sphincterotome, was proper, and that gastroenterologists should use a cannulating sphincterotome when performing ERCP.  Use of a cannulating sphincterotome allows the physician to treat microlithiasis, pancreatic divisum or other ductal abnormalities if they are found.[37]

Dr. Lambiase also testified that his review of Dr. Shad's post-ERCP report and the ERCP film showed that Dr. Shad properly cannulated the pancreatic duct.  While the report references that Dr. Shad deeply cannulated the pancreatic duct, that meant, according to Dr. Lambiase, that Dr. Shad inserted the catheter into the

───────────────

[36]     Id. at pp. 17, 36-39.

[37]     Id. at pp. 26-28.

opening of the pancreatic duct to fill the duct with contrast, rather than simply injecting the contrast superficially into the ampulla.[38]   Dr. Lambiase opined that completely filling the pancreatic duct was also proper.  He stated that if a physician decides to perform an ERCP, he ought to fully perform it, meaning that fully filling the pancreatic duct with contrast is necessary to completely elucidate the anatomical detail of the duct.[39]

Dr. Lambiase also offered an expert opinion on whether Mr. Jackson provided informed consent.  Once again, Dr. Lambiase disagreed with Dr. Sheinbaum's assertion that no reasonable patient with Mr. Jackson's presentation would have consented to an ERCP.  Dr. Lambiase stated that it was entirely within the standard of care for Dr. Shad to recommend that Mr. Jackson proceed with an ERCP, and that

---

[38]     The pancreatic and bile ducts form a "Y" type structure.  The pancreatic duct and bile duct come together at the base of the "Y".  The place where the two ducts come together is called the ampulla. Deep cannulation means the physician injected the contrast directly into either the pancreatic or bile duct, rather than injecting the contrast in the ampulla, which can allow the contrast to spill into either the pancreatic or bile duct.  According to Dr. Lambiase, Dr. Shad inserted the catheter into the beginning of the pancreatic duct, rather than merely injecting dye into the ampulla, to ensure that he definitively filled the pancreatic duct, rather than taking the chance that the contrast would spill into the bile duct.  Dr. Shad also attempted to insert the catheter into the bile duct because he wanted to extract some bile to examine it under a microscope to determine if Mr. Jackson had microlithiasis.  Dr. Shad, however, was unable to enter the bile duct and thus unable to extract bile for the purpose of ruling out microlithiasis as the cause of Mr. Jackson's recurrent pancreatitis.

[39]     Id. at pp. 24-26.

patients normally rely on these types of physician recommendations.  Further, while

Dr. Lambiase noted that he had no opinion on the sufficiency of Dr. Shad's

explanation of the procedure to Mr. Jackson because he was not present during their

discussion, he testified that patients consent to ERCP's all the time.   This is

oftentimes due to an ERCP's therapeutic capabilities, which an EUS does not have.

Dr. Lambiase concluded that since an ERCP has capabilities that an EUS does not

have, a diagnosis of a particular problem with an EUS may ultimately require a

subsequent appointment to perform a therapeutic ERCP.[40]

### I.   Dr. Shad's Decision to Perform ERCP

#### 1.   Decision that additional testing was indicated

Because the evidence concerning precisely when Mr. Jackson was taking

Bumex in 2002 is very unclear, I am unpersuaded by Dr. Sheinbaum's testimony that

it is an "open and shut" case that the September 2002 pancreatitis was clearly drug

induced, thus indicating that no further testing was required.[41]

———————————————

[40]    Id. at pp. 38-39.

[41]    This finding is bolstered by Dr. Sheinbaum's testimony that the longer a patient
takes a medication, such as Bumex, without suffering drug induced pancreatitis, there
is less suspicion that the medication will ultimately cause pancreatitis.  Doc. 62, Trial
Tr. Nov. 14, 2005, Dr. Sheinbaum, pp. 137, 152. Prior to 2002, Mr. Jackson took
Bumex continuously from 1996 to 2000 without incident.   While Dr. Shad was
unaware that Mr. Jackson had taken Bumex during this four year period when he
determined to perform the ERCP, it nevertheless renders less valid Dr. Sheinbaum's
opinion that it is very obvious that Bumex was the cause of Mr. Jackson's September

However, I also find Dr. Shad's testimony that he determined to perform the ERCP primarily because he was concerned about the possibility of pancreatic cancer to be suspect.   Nowhere in the medical records memorializing his pre-operative evaluation of Mr. Jackson does Dr. Shad note that he was concerned about pancreatic cancer.   While the Court can accept that Dr. Shad's October 16, 2002 differential diagnosis was not necessarily meant to be an exhaustive list of potential causes for the July and September 2002 bouts of pancreatitis and that pancreatic cancer is always a consideration in these circumstances, if cancer had in fact been in the forefront of Dr. Shad's mind, he presumably would have listed it along with microlithiasis, pancreatic divisum and idiopathic on the differential diagnosis.[42]

Notwithstanding that Dr. Shad's post hoc justification for performing the ERCP was not entirely persuasive, the Court nevertheless finds that his testimony, the more credible expert testimony and the supporting facts demonstrate there was sufficient doubt about the cause of Mr. Jackson's September 2002 pancreatitis to warrant additional testing.   The American Society of Gastrointestinal Endoscopy ("ASGE")

_____

2002 pancreatitis presentation thereby rendering the ERCP unnecessary.

[42]     Moreover, it is undisputed that pancreatic cancer is one of the most aggressive forms of cancer.   From its inception, pancreatic cancer progresses rapidly and can cause death within six months or less.   Dr. Shad, however, did not ultimately perform the ERCP until almost two months after his initial consultation with Mr. Jackson, and five weeks after the November 6, 2002, consultation.   While Dr. Shad testified that he would like to have expedited Mr. Jackson's treatment, he offered no explanation as to why he showed no haste to perform the ERCP.

-20-

clinical guidelines support this finding.  The ASGE guidelines provide that in cases where there is not a defined etiology for recurrent acute pancreatitis, ERCP "may detect", *inter alia*, pancreatic divisum and other ductal abnormalities.  The ASGE guidelines further note that "ERCP is the best procedure for pancreatic duct visualization and provides the broadest range of therapeutic options."[43]

Those same guidelines provide that an ERCP should not be performed after a single unexplained episode of pancreatitis.  That provision was a focus of plaintiff's trial theory that ERCP was contraindicated because even if the September 2002 onset of pancreatitis was not clearly due to Bumex, the two prior incidents (July 1995 and July 2002) were clearly due to drugs; thus, since the September 2002 incident was a single unexplained episode, the ERCP was not proper.  While drug induced pancreatitis was the diagnosis of the July 1995 and July 2002 episodes and Dr. Shad even thought that the September 2002 episode was "recurrent pancreatitis most likely due to drugs", the proximity of the July and September 2002 episodes, along with the uncertainty of Mr. Jackson's Bumex history created a reasonable medical basis for Dr. Shad to perform additional testing to try to determine the root cause of Mr. Jackson's pancreatitis.  I am persuaded by Dr. Lambiase's testimony that, in the absence of a firm cause of the September episode, a reasonably prudent gastroenterologist would need to entertain causes other than drugs and continue to

---

[43]     See generally Doc. 61, Def. Ex. 12A.

-21-

evaluate Mr. Jackson to rule out other causes of Mr. Jackson's recurrent pancreatitis. According to Dr. Lambiase, given Mr. Jackson's age (56), risk factors and number of pancreatitis episodes, it would have been unreasonable to discontinue ruling out possible causes and to simply assume that the underlying cause of the September episode had resolved itself.

### 2.   ERCP over alternative methods of treatment

As set forth above, a physician who determines to perform a diagnostic procedure other than an ultrasound or CAT scan for determining the cause of recurrent pancreatitis can choose one of three modalities: ERCP, EUS or MRCP.  Dr. Lambiase established that in 2002, MRCP was an evolving technology that was not well suited for obtaining a detailed look at the pancreas and pancreatic ducts.  This leaves EUS and ERCP as the viable options.   Of these two procedures, it is undisputed that ERCP has the most risk; however, that risk is still low.  Drs. Shad, Lambiase and Sheinbaum place the risk of ERCP-induced pancreatitis in the range of three to eight percent, and the risk of death as a result of ERCP somewhere around 1 in 500, or .2%.  Of the patients who undergo an ERCP, ninety to ninety-five percent suffer no complications whatsoever.[44]

_____

[44]    Both experts testified that the risk of complications due to the ERCP was higher for Mr. Jackson because of Mr. Jackson's previous bouts with pancreatitis.  So, ironically, the recurrent nature of the pancreatitis, which provides indication for performing the ERCP, also puts the patient at higher risk for developing pancreatitis from the ERCP procedure.

An EUS carries less risk than an ERCP.  With EUS, there is about a 1 in 10,000 chance of causing internal damage such as making a hole in the digestive tract or causing a perforation to internal organs while moving the EUS to the diagnostic area. There is no risk of causing pancreatitis or death with an EUS.

While Dr. Lambiase admits he would have performed an EUS to further diagnose Mr. Jackson, he did not question Dr. Shad's determination to perform an ERCP based on the prevailing endoscopic practices in 2002.  Dr. Lambiase is an EUS expert, who, in essence, extensively trained himself to perform that procedure.  Dr. Lambiase further noted that while he has become an EUS expert, his colleagues at Shands Hospital in Jacksonville still routinely perform ERCP's as a diagnostic and therapeutic procedure for recurrent pancreatitis.  In fact, Dr. Lambiase, himself, had performed two ERCP's the day before he began testifying in this case.[45]

Dr. Lambiase persuasively testified that an ERCP is an appropriate procedure to diagnose a pancreatic divisum.  While a pancreatic divisum is not a common abnormality, patients with a pancreatic divisum tend to present with complications from this defect later in life.  Typically, this can cause pancreatitis because of inadequate drainage due to the failure of the pancreatic duct to connect.  Dr.

_____

[45]    See generally Doc. 64, Trial Tr. Nov. 17, 2005, Dr. Lambiase, pp. 16-18, 26, 33-34.  Dr. Shad testified that during the 2002 time frame he was performing an average of two ERCP's per week.  He further testified, however, that he also had referred patients for EUS's during the same time period. See Doc. 63, Trial Tr. Nov. 16, 2005, Dr. Shad, pp. 82, 95.

Lambiase credibly testified that the precise science concerning pancreatitis caused by pancreatic divisum and how patients normally present is a source of great debate in the medical community.   Nevertheless, both EUS and ERCP are utilized to diagnose this condition.   Dr. Lambiase testified that ERCP is, in fact, preferable for diagnosing pancreatic divisum as it allows a better view of pancreatic and bile ductal detail, which would illuminate a pancreatic divisum and allow the doctor to insert a stent to therapeutically treat the defect.[46]

I am likewise persuaded by Dr. Lambiase's testimony that an ERCP was appropriate for diagnosing and treating microlithiasis, another potential cause of recurrent pancreatitis listed on Dr. Shad's October 2002 differential diagnosis.  Since ERCP is also a therapeutic procedure, it would have allowed Dr. Shad to remove the stones had he been able to insert the catheter into the bile duct, aspirate bile during the procedure, and confirm the presence of crystals.[47]  Dr. Sheinbaum agreed with this; however, he discounted that microlithiasis was a viable diagnosis because typically, there are also elevated liver enzymes, which was not the case with Mr. Jackson.[48] Overall, the debate between Dr. Sheinbaum and Dr. Lambiase, two board

_____

[46]     Doc. 64, Trial Tr. Nov. 17, 2005, Dr. Lambiase, pp. 38-39.

[47]     Id. at 38.

[48]     Doc. 62, Trial Tr. Nov. 14, 2005, Dr. Sheinbaum, pp. 91-92.

certified gastroenterologists, shows more of a difference of professional opinion rather than that Dr. Shad's treatment was so deficient as to fall below the standard of care.

### J.    Dr. Shad's Performance of the ERCP

I find the testimony of Dr. Lambiase persuasive as to Dr. Shad's performance of the ERCP.  After reviewing the ERCP film, Dr. Lambiase testified there were no improprieties whatsoever in the manner in which Dr. Shad performed the ERCP.[49]  Dr. Shad injected the contrast medium so that it completely filled the pancreatic duct; this allowed Dr. Shad to completely elucidate the anatomical detail of the duct.[50]  If Dr. Shad had underfilled the duct, he would not have had a complete view.  The method of completely filling the duct allowed Dr. Shad to determine whether there were any other pancreatic abnormalities, such as pancreatic divisum.[51]

I also conclude that Dr. Lambiase's testimony concerning Dr. Shad's use of a cannulating sphincterotome to be more persuasive than that of Dr. Sheinbaum.  Dr. Lambiase points out that there is no literature that a sphincterotome is more likely to cause complications over and above a regular catheter; in fact, the regular practice

---

[49]    See generally Doc. 64, Trial Tr. Nov. 17, 2005, Dr. Lambiase, pp. 23-30.

[50]    Id. at 24-25.

[51]    Id. at 25.

is to use a sphincterotome when performing an ERCP.[52]

Moreover, Dr. Shad credibly explained that even though he described the cannulation as "deep", he cannulated just beyond the opening of the pancreatic duct and injected the contrast into the pancreatic duct, rather than injecting the contrast into the ampulla.  Dr. Sheinbaum admitted that he did not review the ERCP film to determine the point at which the contrast was injected, but that he only reviewed Dr. Shad's post-ERCP report.[53]

### K.    Informed Consent

During Mr. Jackson's November 6, 2002 visit to Dr. Shad, Dr. Shad discussed with Mr. Jackson his diagnostic and treatment options; these options were ERCP, EUS, MRCP, or no further treatment.   While Dr. Shad discussed Mr. Jackson's options with him, it is clear that Dr. Shad strongly recommended the ERCP procedure over any other option.  At the conclusion of that visit, Dr. Shad provided Mr. and Mrs. Jackson with a pamphlet explaining the ERCP procedure in lay terms.[54]   According to Mrs. Jackson, Mr. and Mrs. Jackson took the pamphlet home and read it before the procedure was performed.

————————————

[52]     Id. at 27.

[53]     Doc. 62, Trial Tr. Nov. 14, 2005, Dr. Sheinbaum, p. 204.

[54]     See Pl. Ex. 8, pp. 240-41 (ERCP informational pamphlet).

On December 12, 2002, Mr. Jackson returned to Dr. Shad for the ERCP. Before Dr. Shad performed the procedure, he presented a consent form to Mr. Jackson.  While the form is somewhat generic, it nevertheless outlines precisely how the procedure would be performed, the attendant risks, and that alternative[55] courses of treatment were discussed.  It clearly explains that pancreatitis, bleeding, perforation and infection are uncommon complications, and that those complications can be serious and even lead to death.  Mr. Jackson signed the form, as did Dr. Shad, in the presence of a witness.[56]  Mrs. Jackson testified there was no discussion about alternative procedures and she understood the procedure was designed to detect "gallstones".[57]

_____

[55]     The form states that "alternative methods of treatment" were discussed, but does not specifically mention EUS, MRCP, or the option to have no procedure.  Dr. Shad testified, however, that he discussed these options with Mr. Jackson and that he recommended the ERCP.

[56]     The witness on the form, apparently someone named "G. Adams", was not called to testify at trial.

[57]     While Mrs. Jackson accompanied Mr. Jackson to his appointments with Dr. Shad leading up to the December 12, 2002, ERCP, it is unclear whether Mrs. Jackson was present when Dr. Shad explained the consent form to Mr. Jackson immediately before the procedure was performed.

## II.     CONCLUSIONS OF LAW

### A.     Federal Tort Claims Act Liability

Under the FTCA, the United States may be held liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §1346(b)(1).   The law of the state where the alleged negligent act or omission occurred governs the rights and liabilities of the parties.  Richards v. United States, 369 U.S. 1, 11 (1962).  Here, all the alleged acts or omissions took place in Florida and the parties agree that the Court must apply Florida substantive law in resolving issues of liability and damages.

### B.     Applicable Standards of Care in Selection of Treatment

In a medical negligence case, the plaintiff must establish by a preponderance of the evidence the acceptable standard of care owed by the physician, produce evidence that the physician breached the duty to render medical care in accordance with the requisite standard of care, and establish that the breach proximately caused the injury alleged.  Gooding v. University Hospital Building, Inc., 445 So. 2d 1015, 1018, 1020 (Fla. 1984); Torres v. Sullivan, 903 So. 2d 1064, 1067 (Fla. 2d DCA 2005); Moisan v. Kriz, 531 So. 2d 398, 399 (Fla. 2d DCA 1988).  Section 766.102(1),

Florida Statutes (2002), codifies the prevailing professional standards of care.  That statute provides, in pertinent part:

> In any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider ... the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

The Florida Standard Jury Instructions also set forth the applicable legal framework for a factfinder to use in determining the issue of negligence in a medical malpractice case.  Florida Standard Jury Instruction No. 4.2a provides, "[n]egligence is the failure to use reasonable care.  Reasonable care on the part of a physician is that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably careful physicians."

Florida statutes likewise codify the negligence standards governing the performance of unnecessary diagnostic procedures.  Section 766.111(1), Florida Statutes (2002), provides, in pertinent part that "[n]o health care provider...shall order, procure, provide, or administer unnecessary diagnostic tests, which are not reasonably calculated to assist the health care provider in arriving at a diagnosis and treatment of a patient's condition."  A claim for an unnecessary procedure or surgery

-29-

is cognizable under Florida law.  Bush v. United States, 703 F.2d 491, 496 (11th Cir. 1983).  If, however, the performance of the procedure at issue is customary in situations like that presented by the patient, the decision to perform the procedure does not violate the standard of care.  Id.

For the reasons discussed above, the Court concludes that plaintiff has failed to prove by a preponderance of the evidence that Dr. Shad violated the standard of care in ordering additional testing.  Moreover, the evidence establishes that Dr. Shad had two viable diagnostic procedures to choose from in further diagnosing Mr. Jackson's recurrent pancreatitis: EUS and ERCP.  While ERCP is more invasive and carries with it a greater risk of causing pancreatitis and other complications, including death in .2% of the cases, it was nevertheless regarded as a medically acceptable procedure to diagnose and treat recurrent pancreatitis.  Dr. Lambiase's testimony that he would have first performed an EUS, rather than an ERCP, does not mandate that an ERCP was a wrong or inappropriate choice.  Dr. Lambiase unequivocally stated that his colleagues, even those working in his group at Shands Hospital Jacksonville, were (and still are) routinely performing ERCP's to diagnose recurrent pancreatitis. Even if EUS, or as Dr. Sheinbaum testified, an MRCP, were the preferred modalities with Mr. Jackson's presentation, ERCP was nevertheless a medically acceptable choice.

Precedent establishes that when a physician chooses a medically acceptable

-30-

course of treatment, the courts will not engage in post hoc criticism of the treatment decision simply because the results of the procedure are catastrophic.  Bush, 703 F.2d at 496.  While Bush is not factually identical to this case, the scenario presented there is nevertheless similar.

In Bush, a patient was admitted to Tampa's VA hospital complaining of lost appetite, nausea, jaundice and excretion of dark urine.  Id. at 493.  The initial diagnosis was obstructive jaundice.  Id. After extensive testing, the patient underwent exploratory surgery to further diagnose whether he could be suffering from pancreatic cancer.  Id.  During the operation, the physician removed a stone obstructing the common bile duct, but because he was not convinced that he had identified the root of the problem, the physician conducted further exploratory surgery, including seven biopsies.  Id.  All seven biopsies were negative for cancer, but the doctor determined to perform a Whipple Procedure[58] because the head of the pancreas felt enlarged and grainy, further tests indicated that the biliary ducts were filled and dilated, and the irregularities in the common bile duct were indicative of a cancerous tumor.  Id.

After the surgery, the patient went into shock, experienced pulmonary embolus, pancreatitis, a ruptured spleen, and ultimately died.  Id.  Plaintiff's expert testified that there was "not one shred of evidence" that the patient had cancer; thus, the Whipple

---

[58]     A Whipple Procedure is a massive cancer operation which involves the removal of the head of the patient's pancreas, forty percent of the stomach, the gall bladder, the common duct, and the duodenum.

Procedure, which caused the patient's death, was medically unnecessary and the election to perform it fell below the standard of care. Id. at 496. Defendant's expert testified (very similar to Dr. Lambiase here) that even though he would have stopped short of performing the Whipple Procedure, the VA surgeon made a valid judgment call to perform it because he felt there was a cancer in the bile duct that was the root cause of all the problems. Id.

The issue on appeal, *inter alia*, was whether the district court properly determined that the plaintiff failed to prove by a preponderance of the evidence that the VA surgeon was negligent in choosing to perform the surgery. Id. at 495. In affirming the district court's findings, the Eleventh Circuit noted that, at the time the procedure was performed, the VA surgeons had a policy of performing this extreme operation in the hopes of catching this virulent form of cancer early, even if the prospects of cancer were "speculative." Id. at 496. Further, since the performance of the Whipple Procedure in the situation presented was a medically acceptable decision in the medical community, the district court did not err in finding no malpractice. Id.

Like the physician in Bush, Dr. Shad was presented with a professional judgment call. While an ERCP was the more invasive procedure, and an EUS may well have elicited the same or similar information about Mr. Jackson's recurrent pancreatitis, Dr. Shad chose a medically acceptable procedure for diagnosing and

potentially treating microlithiasis, pancreatic divisum, and other pancreatic and biliary ductal abnormalities.  Like the EUS, ERCP was also a reliable diagnostic procedure for confirming a diagnosis of idiopathic pancreatitis.

While the Court is mindful that Dr. Shad had other potentially viable medical options, perhaps including performing no procedure and simply monitoring Mr. Jackson (whose symptoms had resolved by the time he saw Dr. Shad), the more persuasive and credible evidence shows that Dr. Shad made a medically acceptable judgment call.  Though there is no dispute that the procedure caused the death of Mr. Jackson, the plaintiff has not proven by a preponderance of the evidence that Dr. Shad made a medically unacceptable determination to proceed with an ERCP.

### C.    Performance of ERCP

Plaintiff failed to show by a preponderance of the evidence that Dr. Shad negligently performed the ERCP.  The Court rejects Dr. Sheinbaum's testimony on this point and accepts Dr. Lambiase's.  Dr. Lambiase testified that the routine practice is to use a sphincterotome first.  Dr. Lambiase's review of the post ERCP report shows that Dr. Shad properly cannulated the pancreatic duct and properly filled the pancreatic duct with contrast.  The Court concludes that Dr. Shad's decision to use a cannulating sphincterotome, as opposed to a diagnostic sphincterotome, and the method in which the ERCP was performed, fell within the standard of care.

### D.    Informed Consent

Florida's Medical Consent Law governs the informed consent issues in this case.  Section 766.103(3)(a), Florida Statutes (2002), provides, in pertinent part:

> No recovery shall be allowed in any court ... in an action brought for treating, examining, or operating on a patient without his or her informed consent when: [t]he action of the physician ... in obtaining the consent of the patient ... was in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community; and [a] reasonable individual, from the information provided by the physician ... would have a general understanding of the procedure, the medically acceptable alternative procedures or treatments, and the substantial risks and hazards inherent in the proposed treatment or procedures, which are recognized among other physicians ... in the same or similar community who perform similar treatments or procedures.[59]

Moreover, Florida Standard Jury Instruction 4.2b addresses the applicable legal standards as to whether a physician provides sufficient information to the patient in obtaining informed consent.  That instruction states:

> Negligence is the failure to use reasonable care.  Reasonable care on the part of a physician in obtaining the informed consent to treatment of a patient consists of providing the patient information sufficient to give a reasonable person a general understanding of the proposed treatment or procedure, of any medically acceptable alternative treatments or procedures, and of the substantial risks and hazards inherent in the proposed treatment or procedure which are recognized by other

_____

[59]    While Florida law provides a rebuttable presumption in favor of informed consent in certain situations, Fla. Stat. § 766.103(4), Parikh v. Cunningham, 493 So. 2d 999 (Fla. 1986), the Court, sitting as the factfinder, has not utilized this presumption and has simply determined whether plaintiff has proven by a preponderance of the evidence that Mr. Jackson's consent failed to meet the statutory standards.

-34-

> physicians in the same or a similar community who perform similar
> treatments or procedures.

Florida Standard Jury Instruction No. 4.2b.

The threshold inquiry here is whether Dr. Shad met the statutory elements of

an informed consent, including whether Dr. Shad provided sufficient information to Mr.

Jackson concerning the ERCP and the available alternative treatments.  Based on the

information set forth in the ERCP pamphlet provided to Mr. and Mrs. Jackson, the

language on the consent form signed by Mr. Jackson, and Dr. Shad's explanation of

the ERCP to Mr. and Mrs. Jackson, I find that Mr. Jackson had a sufficient lay

understanding of ERCP, the method in which it would be performed, and the inherent

risks.  While the consent form and medical records do not specifically note that Dr.

Shad discussed EUS and MRCP, the consent form itself provides that "alternative

methods of treatment" were discussed.

It is true that Dr. Shad  recommended that Mr. Jackson undergo the ERCP.  As

a practical matter, patients rely on their physicians to not only explain the alternative

procedures, but to recommend a course of action.  The practice of medicine does not

entail laying out a panoply of options and allowing a patient to simply choose his or

her course.  Physicians are trained to identify various options, and to recommend the

treatment they deem best fits the presentation of the patient.  Here, Dr. Shad did that

and recommended Mr. Jackson proceed with an ERCP over an EUS, MRCP, or no

testing at all.  Undoubtedly, this affected Mr. Jackson's decision to choose the ERCP.

-35-

Nevertheless, Dr. Shad obtained a valid informed consent because he sufficiently identified and explained the viable medical options, and Mr. Jackson signed a valid consent form that explained the attendant risks.

Even assuming Dr. Shad did not meet the statutory requirements delineated in § 766.103(3)(a), Florida Statutes (2002), which I find he did, I further find that Mr. Jackson "would reasonably, under all the surrounding circumstances, have undergone [the ERCP] had he ... been advised by [Dr. Shad] in accordance with ... paragraph (a)." Fla. Stat. § 766.103(3)(b); <u>Gassman v. United States</u>, 589 F.Supp. 1534, 1547 (M.D. Fla. 1984) (analyzing the predecessor statute to the current Medical Consent Law, Fla. Stat. §768.46, which contains substantially the same language as the current law, and recognizing that if a court finds that there was no valid consent given pursuant to subsection 3(a), the alleged tortfeasor may find a shelter from liability under subsection 3(b)), *aff'd* 768 F.2d 1263 (11th Cir. 1985). Subsections 3(a) and 3(b) of §766.103(3) are written in the disjunctive; therefore, if the evidence shows that Dr. Shad failed to comply with the statutory requirements set forth in subsection 3(a), he is nevertheless shielded from liability under subsection 3(b) if it was reasonable under the circumstances for Mr. Jackson to undergo the ERCP notwithstanding the fact that no informed consent was obtained.

Drs. Sheinbaum, Lambiase and Shad testified that in 2002 ERCP was a common diagnostic procedure that was, and still is, widely used to diagnose recurrent

pancreatitis.  While Dr. Lambiase is an EUS expert, he and his Shands colleagues routinely perform ERCP's.  In fact, Dr. Shad testified that he had performed 300 ERCP's in his career up to the date he performed Mr. Jackson's, and that he performed roughly two per week while he was the head of gastroenterology at Naval Hospital Jacksonville.  While the tragic result of the ERCP here tends to obfuscate the legal issue presented, the frequency with which ERCP's are performed throughout the medical community and the low risk of complications and even lower risk of death leads the Court to conclude that, under the circumstances in this case, it was reasonable for Mr. Jackson to have undergone the ERCP.  Plaintiff has failed to prove by a preponderance of the evidence that Mr. Jackson did not give informed consent for the ERCP.

## III.    CONCLUSION

The biggest concern Mr. and Mrs. Jackson had on December 12, 2002, the morning that Mr. Jackson reported to Naval Hospital Jacksonville for the outpatient ERCP procedure, was whether he would be able to take a scheduled trip the next day to Fort Bragg, North Carolina to visit family.  No one, not Mr. Jackson, not Mrs. Jackson, not Dr. Shad, anticipated that two days later he would be dead from complications caused by the ERCP.  All sympathy rightly lies with Mrs. Jackson, whose life has been turned upside down by this tragedy.  However, a court is not permitted to be swayed by sympathy and must dispassionately find the facts and

apply the law.  I have labored to do so conscientiously.  In a difficult and close decision, I hold that the plaintiff has failed to prove by a preponderance of the evidence that Dr. Shad's treatment of Mr. Jackson fell below the standard of medical care required by Florida law.

Judgment will be entered in favor of the United States on all claims.


**DONE AND ORDERED** at Jacksonville, Florida this 31st day of January, 2006.


TIMOTHY J. CORRIGAN
United States District Judge


t.
Copies: counsel of record

-38-